Pg 1 of 10

KIRBY AISNER & CURLEY LLP
*Proposed Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
(914) 401-9500
Erica R. Aisner, Esq.
eaisner@kacllp.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

NEW YORK CLASSIC MOTORS, LLC,

                             Debtor.
-----------------------------------------------------------X

Chapter 11
Case No. 21-10670-MG

## DECLARATION OF ZACHARY MOSELEY
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN
## SUPPORT OF FIRST DAY MOTIONS PURSUANT TO LOCAL RULE 9077

ZACHARY MOSELEY, hereby declares under penalties of perjury:

I am the Managing Member of Metro Classic Car Management, LLC, which is the Managing Member of New York Classic Motors, LLC, the above-referenced debtor and debtor-in-possession (the "Debtor"). As such, I am fully familiar with the Debtor's operations, businesses and financial affairs.

I submit this Declaration pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 1007-2 and 9077 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York and in support of the Debtor's motions and applications (discussed in Part III).

Part I of this Declaration describes the Debtor's business and circumstances leading to the commencement of this Chapter 11 case. Part II provides information required by Local Bankruptcy Rule 1007-2. Part III provides relevant facts in support of the Debtor's First

Day Motions (defined herein).

## Part I

1. The Debtor is a New York limited liability company duly incorporated under the laws of the State of New York that maintains its principal place of business at 1 Pier 76, New York, New York (the "Premises"). The Premises is located adjacent to the former New York City Tow Pound and across from the Javits Center.

2. The Debtor, together with its affiliates, operates a first-class automobile showroom that is open to the public and a luxury private automobile club that features a lounge, two bars, a restaurant and terrace overlooking the Hudson River.

3. The specific portion of the overall operation which the Debtor owns and operates the Premises and managers the fleet. Currently, there are approximately 1,000 members who enjoy not only access to the Debtor's impressive and rarified fleet, but also have access to the food and beverage operation and event space which is operated by an affiliate of the Debtor at the Premises.

4. The concept for the Classic Car Club ("CCC"), which is the name under which the Debtor and its affiliates operate, was initially launched by Phil and Dave Kavanagh in 1995 in London. The idea was simple - to make it easy for ordinary people to drive extraordinary cars. CCC is the first private auto club of its kind and its fleets include cars ranging from Italian supercars, English roadsters, vintage American muscle cars to automobiles built for motorsport.

CCC has produced more than 2,000 events for its members including rallies through Europe and America, track days on world-famous racing circuits around the world, rarified culinary experiences, participation in its automotive and motorcycle racing teams, fashion shows, mechanics classes and many other fantastic experiences.

5.      The Debtor became part of the Hudson River Park community in spring of 2016, when it entered into a Concession Agreement (the "Agreement") with the Hudson River Park Trust, Inc. ("HRPT")[1] pursuant to which it took possession of the southern annex of pier 76 – the former home of the NYPD mounted unit. The Agreement provides for a term running through December 31, 2024.

6.      At the time it took possession, the Premises was structurally compromised and in a poor state of upkeep.  The Debtor was forced to spend $6 million dollars to bring the facility up to proper, legal and functional standards.  The renovation of Pier 76 by the Debtor was celebrated in *Architectural Digest, Bloomberg* and other authoritative publications.

7.      In accordance with the Agreement, the Debtor provides a number of valuable services to the public at no cost: monthly auto shows, mechanic/shop classes; outdoor seating at the southern portion of the Premises; as well as science and technology programming, which has included F1 in Schools (an international STEM competition for grade school).

8.      During 2020, while the Covid-19 pandemic raged, the State of New York forced full and partial closures of restaurants and events.  The Debtor and its affiliates followed State guidelines and the result was a loss of $4 million in revenues.  During this time, HRPT demanded full rent payment, even though there is a clause in the Agreement that provides for a reduction in rent should it be forced to shut part or all of its business by the property owner.

9.      The Debtor continues to operate at 35% as required by the State.

10.     Notwithstanding the Debtor's efforts to negotiate a rent reprieve and its continued remittance of partial rent throughout, HRPT refused. Ultimately HRPT served a Notice of Default and Demand to Cure (the "Rent Demand") and threatened termination of the Agreement

---

[1] Although HRPT manages the Premises, the owner is the New York State Office of Parks, Recreation & Historic Preservation.

for non-compliance.

11. Then, on or about January 4, 2021, HRPT served a letter invoking its right to terminate the Agreement provided therein for redevelopment ("Termination Notice"). While the tow pound is currently being removed, there is no development plan. The State has publicly stated that it intends to leave the skeletal structure of the tow pound intact and make it open public space. This announcement included a rendering of the open space and the Premises, equipped with the Debtor's $6m improvements is part of that rendering and strategy.

12. On February 1, 2021, to preserve its rights and protect its most valuable asset, the Premises, the Debtor filed an Order to Show Cause in State Court seeking a "Yellowstone injunction." The Debtor required a tolling of the various noticed served by HRPT in order to afford it the necessary time to adjudicate the issues between the Debtor and HRPT including but not limited to the amount of rent due after application of offsets to which the Debtor is entitled and the validity and enforceability of the Rent Demand and Termination Notice.

13. The State Court granted the Debtor an injunction but required that it pay three months of past due rent in full which is approximately $175,000. The State Court further required the Debtor to post a bond equal to the amount of past due rent claimed by HRPT which is approximately $585,000. Unfortunately, these requirements were simply too onerous for the Debtor.

14. As a result of the ongoing dispute with HRPT and given the current state of operations during the pandemic, in order to preserve and protect the Debtor, its operations and its valuable assets, the Debtor sought the protections of the Bankruptcy Court. The Debtor intends to adjudicate its claims against HRPT to resolution as well as to liquidate two other State Court litigation claims which it has been defending for some time. Once these matters are resolved, and

as the pandemic related restrictions continue to be lifted, the Debtor is confident that it will be able to propose a feasible plan of reorganization for confirmation.

15. The Declarant submits that the best interests of the estate and its creditors will be served through this Chapter 11 case and the Debtor remaining in possession of its assets and managing its own affairs, under the supervision of the Court, as a debtor-in-possession.

## Part II

## INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007-2

16. In addition to the foregoing, Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

    a. **Local Rule 1007-2(a)(1):** As set forth at length above, the Debtor operates a membership-based car club automobile showroom that is open to the public which is part of a larger operation including event space, a lounge, two bars, a restaurant and terrace overlooking the Hudson River.

    b. **Local Rule 1007-2(a)(2)**: This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

    c. **Local Rule 1007-2(a)(3)**: Upon information and belief, no committee or professionals were employed prior to the filing of the Order for relief.

    d. **Rule 1007-2(a)(4)**: A list of the holders of the 20 largest general unsecured claims will be filed with the Court under separate cover.

    e. **Local Rule 1007-2(a)(5)**: A list of the Debtor's 5 largest secured creditors will be filed with the Court under separate cover.

  f. **Local Rule 1007-2(a)(6):** A recent balance sheet is not currently available.

  g. **Local Rule 1007-2(a)(7)**: There are no publicly held securities of the Debtor.

  h. **Local Rule 1007-2(a)(8)**: None of the Debtor's property is in possession of a receiver or custodian.

  i. **Local Rule 1007-2(a)(9) and (10)**: The Debtor leases its only business premises which is located at Hudson River Park, 1 Pier 76, 408 12th Avenue, New York, New York, which is also the location of the Debtor's books and records. The Debtor has no assets located outside the territorial limits of the United States.

  j. **Local Rule 1007-2(a)(11)**: There are currently two pending lawsuits against the Debtor:

   i. *On The Marc, LLC v. New York Classic Motors, LLC*, Supreme Court of the State of New York, County of New York, Index No. 651695/2019; and

   ii. *Marc Becker v. CCC NFP, Inc. and New York Classic Motors, LLC*, Supreme Court of the State of New York, County of New York, Index No: 657376/2020.

  k. **Local Rule 1007-2(a)(xiii)**: The Debtor's senior management consists of Declarant, Phil Kavanagh and Michael Prichinello.

  l. **Local Rule 1007-2(b)(1)-(3):** The Debtor's estimated payroll to non-insider, non-officer employees for the thirty (30) day period following the

Chapter 11 petition is $27,400. The Debtor's estimated payroll to insider officers for the thirty (30) day period following the Chapter 11 petition is $8,392. A schedule of anticipated income and expenses over the same thirty (30) day period is annexed to the cash collateral motion.

### Part III

### FIRST DAY MOTIONS AND APPLICATION FOR HEARING ON SHORTENED NOTICE

17. Contemporaneously with the filing of this Declaration and in connection with the filing of this Chapter 11 case, the Debtor expects to file the following:

   a. Motion for Order Seeking Authority, on Shortened Notice, (I) to Use Cash Collateral Pursuant to Bankruptcy Code Section 363(C)(2) and Granting Adequate Protection Therefor (the "Cash Collateral Motion"), (ii) Scheduling a Final Hearing; and

   b. Motion of the Debtor for Entry of An Order Authorizing the Maintenance of Existing Bank Accounts and Banking Practices ("Bank Maintenance Motion")

(collectively, the "First Day Motions").

18. In addition to the First Day Motions, the Debtor has filed an Application for entry of an order scheduling a hearing on shortened notice on the First Day Motions. The relief sought in the First Day Motions is immediately necessary to enable the Debtor to operate effectively as a debtor-in possession following the commencement of its Chapter 11 case.

19. I submit that the relief request in the First Day Motions should be heard and determined on an expedited basis in order to allow the Debtor to continue its normal business operations without any interruption, which interruption that could severally detriment the Debtor's ability to successfully reorganize.

20. With respect to the Debtor's Cash Collateral Motion, without immediate relief from the Court authorizing the Debtor's use of cash collateral, the Debtor's would be unable to conducts its normal business operations, thereby crippling the Debtor's ongoing operations and jeopardizing its reorganization efforts.

21. With respect to the Bank Maintenance Motion, the Debtor receives and remits numerous electronic transactions on a daily basis. Requiring the Debtor to close its existing account and open new accounts would cause great confusion, delay and administrative expense which would directly impact the Debtor's cash flow and jeopardize the Debtor's ongoing operations and reorganization efforts as well.

22. I submit believe that good cause exists to shorten notice of First Day Motions which typically requires a minimum of twenty (20) days' notice as provided for in Federal Rule of Bankruptcy Procedure 2002.

23. I have reviewed each of the First Day Motions and Orders and the facts set forth there in are true and correct to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
April 14, 2021

/s/ Zachary Moseley
Zachary Moseley
Managing Member of Metro Classic Car Management, LLC, as Managing Member of New York Classic Motors, LLC

EXHIBIT "A"

Twenty Largest Unsecured Creditors

EXHIBIT "B"
Five Largest Secured Creditors