KIRBY AISNER & CURLEY LLP
*Proposed Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
Tel: (914) 401-9500
Erica R. Aisner, Esq.
eaisner@kacllp.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

NEW YORK CLASSIC MOTORS, LLC,                    Chapter 11
                                                 Case No. 21-10670-MG
                        Debtor.
-----------------------------------------------------------X

**DEBTOR'S MOTION FOR AN ORDER (I) AUTHORIZING THE
DEBTOR'S USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C.
§363(c)(2) AND BANKRUPTCY RULE 4001 ON AN INTERIM BASIS AND
PROVIDING ADEQUATE PROTECTION THREFOR PURSUANT TO
11 U.S.C. §§361 AND 362  AND (II) SCHEDULING A FINAL HEARING**

New York Classic Motors, LLC, the above captioned debtor and debtor-in-possession (the "Debtor"), by its proposed attorneys, Kirby Aisner & Curley LLP, files this motion (the "Motion") for entry of an Order (I) Authorizing the Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. §363 and Providing Adequate Protection Therefor Pursuant to 11 U.S.C. §§361 and 362 and (II) Scheduling a Final Hearing, respectfully state and represent as follows:

**Jurisdiction**

1.   This Court has jurisdiction over this Motion under 28 U.S.C. §§ 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§1408 and 1409.

2.   The statutory bases for the relief requested herein are §§ 105(a), 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and

1

Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3. On April 9, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued in possession of its property and the management of its business affairs as debtors-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed.

4. The Debtor is a New York limited liability company duly incorporated under the laws of the State of New York and maintains its principal place of business at 1 Pier 76, New York, New York (the "Premises").

5. The Debtor, together with its affiliates, operates a first-class automobile showroom that is open to the public and a luxury private automobile club that features a lounge, two bars, a restaurant and terrace overlooking the Hudson River.

6. The Debtor's bankruptcy was precipitated by a continued dispute between the Debtor and Hudson River Park Trust ("HRPT"), its landlord, arising out of a Concession Agreement between the parties that provides for the Debtor's use and occupancy of the Premises.

7. The Debtor believes that with the help of counsel, that it will be able to restructure its affairs and propose a plan of reorganization that it is in the best interests of its creditors and affords them the greatest recovery possible.

## PRE-PETITION SECURED DEBT

8. There are three creditors that assert a "blanket lien" on all of the Debtor's assets, HIL Holdings I LLC ("HIL"), American Express National Bank ("AMEX") and US Small Business Administration ("SBA").

A. **HIL Notes**

9. On or about October 24, 2016, the Debtor obtained credit in the amount of $1,300,000 from Nick Advani ("Advani") and issued a promissory note therefor (the "2016 Note").

10. On or about September 5, 2017, the Debtor obtained additional credit in the amount of $500,000 from Advani and issued a promissory note therefor (the "2017 Note").

11. On November 24, 2017, the Debtor and Advani entered into a Note Satisfaction and Cancellation Agreement pursuant to which Advani entered into a Note Purchase Agreement (the "2017 NPA") which provided for the termination and replacement of the 2017 Note with the issuance of a new promissory note of even date in the original principal amount of $1,000,000, such amount reflecting the outstanding principal amount of the 2017 Note plus an additional $500,000 advance of funds. The 2017 NPA further provided for an additional $250,000 in promissory notes which could be issued by the Debtor to certain Purchasers (as that term is defined in the 2017 PSA). A copy of the 2017 NPA is annexed hereto as **Exhibit "A"** and made a part hereof.

12. On or about November 24, 2017, the Debtor and Advani entered into a Security Agreement (the "2017 Security Agreement") which secured the obligations due under the 2017 NPA by granting a blanket lien on the assets of the Debtor in favor of Advani, as set forth more fully therein. On December 5, 2017 a UCC-1 Financing Statement was filed by Advani thereby perfecting his lien on the Debtor's assets pursuant to the 2017 Security Agreement. Copies of the 2017 Security Agreement and related UCC-1 Financing Statement are annexed hereto as **Exhibit "B"** and made a part hereof.

13. On March 28, 2018, the 2017 NPA was amended to, *inter alia*, increase the

3

principal amount to $1,600,000 (the "March 2018 Amendment"). The 2017 NPA, as amended, allowed for the issuance of additional promissory notes thereunder (as part of the $1.6 million) to additional Purchasers. A copy of the March 2018 Amendment is annexed hereto as **Exhibit "C"** and made a part hereof.

14. On April 2, 2018, in connection with and pursuant to the March 2018 Amendment, an additional promissory note in the amount of $500,000 (the "Chadha Note") was issued to Gaurang Chadha ("Chadha"). To be clear, this issuance did not represent new debt but was part and parcel of the 2017 NPA as amended by the March 2018 Amendment and secured pursuant to the 2017 Security Agreement.

15. On April 30, 2018, the Debtor and Advani entered into a Note Satisfaction and Cancellation Agreement pursuant to which Advani entered into a Senior Note Purchase Agreement (the "2018 NPA") which provided for the termination and replacement of the 2016 Note in full and the issuance of a new promissory note of even date in the original principal amount of $830,008.33, such amount reflecting *a portion* of the principal amount due under the 2016 Note. A copy of the 2018 NPA is annexed hereto as **Exhibit "D"** and made a part hereof.

16. On or about April 30, 2018, the Debtor and Advani entered into a Security Agreement (the "2018 Security Agreement") which secured the obligations due under the 2018 NPA by granting a blanket lien on the assets of the Debtor in favor of Advani, as set forth more fully therein. On June 4, 2018 a UCC-1 Financing Statement was filed by Advani thereby perfecting his lien on the Debtor's assets pursuant to the 2018 Security Agreement. Copies of the 2018 Security Agreement and the related UCC-1 Financing Statement are annexed hereto as **Exhibit "E"** and made a part hereof.

17. On April 30, 2018 the 2017 NPA was further amended to, *inter alia,* increase the

aggregate amount due thereunder which could be issued to Purchasers to $2,000,000 (the "April 2018 Amendment"). An additional promissory note was also issued by the Debtor in the amount to $500,000 which represented the amount of outstanding principal under the 2016 Note that was not refinanced under the 2018 NPA ("500K Advani Note").

18.    The 2017 NPA was further amended as of August 1, 2018, to, *inter alia*, increase the outstanding amount due under the 2017 NPA to $2,100,000.

19.    On October 15, 2018, in connection with and pursuant to the April 2018 Amendment, an additional promissory note in the amount of $100,000 (the "Nassif Note") was issued to Freda Nassif ("Nassif"). Just as with the Chadha Note, this issuance did not represent new debt but was part and parcel of the 2017 NPA as amended by the March 2018 Amendment.

20.    The 2018 NPA, as amended, was due to be repaid in full by March 31, 2020, and the 2017 NPA, as amended, was due to be repaid in full on December 31, 2020. However, due to the effects of the COVID-19 pandemic on the Debtor's business, the Debtor was unable to repay the Notes on such dates thereby causing a default thereunder.

21.    Thereafter, on or about March 1, 2021, the 2018 NPA, as amended, and the 2017 NPA, as amended and the 500K Advani Note were assigned by Advani to HIL pursuant to written assignments. The Chadha and Nassif Notes were also assigned to HIL in connection therewith.

22.    On March 1, 2021, the Debtor entered into a forbearance agreement with HIL pursuant to which HIL agreed to forbear from exercising its rights and remedies against the Debtor until June 1, 2021. The parties further agreed that during the forbearance period the Debtor would remit interest only payments to HIL at a rate of 10% plus all attorneys' fees and costs incurred by HIL in connection with the obligations due it from the Debtor. In connection

5

with and pursuant to the forbearance agreement, the parties agreed to enter into new promissory notes evidencing the current aggregate obligation due in the amount of $2,900,000 (the "2021 Promissory Notes"). Copies of the 2021 Promissory Notes are annexed hereto as **Exhibit "F"**.

### B. AMEX Loan

23. On or about June 24, 2019, the Debtor entered into a Loan (the "AMEX Loan") with AMEX in the original principal amount of $155,000 plus accrued interest at a rate of 8.00%. In connection therewith, on or about June 27, 2019, AMEX filed a UCC-1 financing statement which states that it holds a lien on "[a]ll assets of the Debtor, whether now owned or hereafter acquired or arising."

24. The AMEX Loan was paid off pre-Petition Date and the UCC-1 financing statement filed in connection with that obligation should have been terminated by the creditor.

25. As no money is currently due and owing, the Debtor does not believe that AMEX holds a valid lien on the Debtor's assets.

### C. SBA Note

26. On or about June 17, 2020, pursuant to the CARES Act, the Debtor entered into a loan agreement and promissory note in the original principal amount of $150,000 plus accrued interest at a rate of 3.75% per annum (the "SBA Loan").

27. In order to secure the obligations due under the SBA Loan, on or about November 24, 2017, the Debtor and the SBA entered into a security agreement (the "SBA Security Agreement" and together with the promissory note and loan agreement, the "SBA Loan Documents") that granted a blanket lien on the assets of the Debtor in favor of SBA, as set forth more fully therein. On June 29, 2021, a UCC-1 financing statement was filed by the SBA thereby perfecting its lien on the Debtor's assets pursuant to the SBA Security Agreement.

Copies of the SBA Loan Documents and related UCC-1 financing statement are annexed hereto as **Exhibit "G"** and made a part hereof.

28. The SBA Loan Documents require the Debtor to make monthly installments of principal and interest in the amount of $731.00 monthly, beginning twelve (12) months from the date of the SBA Loan. The balance of principal and interest will be payable thirty (30) years thereafter.

29. As of April 9, 2021, there remained approximately $150,000 due and owing from the Debtor to the SBA.

**Relief Requested**

30. The Debtor submits this Motion pursuant to Bankruptcy Code §363(c)(2)(B) and 361 and 362 and Bankruptcy Rule 4001(b) with respect to the Debtor's request for authority to use cash and cash equivalents which constitute cash collateral, as that term is defined below ("Collateral") in which HIL and the SBA (collectively, the "Secured Lenders") assert a security interest, substantially in accordance with the terms and conditions set forth in the proposed Interim Order (the "Order") annexed hereto as **Exhibit "H"**. The Debtor believes that the Secured Creditors are the only parties that hold a perfected security interest in the Debtor's property which may constitute Collateral.

31. The proposed Order grants the Debtor the authority to use the Collateral pursuant to Bankruptcy Code §§363 and Bankruptcy Rule 4001(c) to the extent necessary to continue the operation of its business and to preserve the value of its estate during the course of the Chapter 11 case.

32. Section 363(a) of the Bankruptcy Code states as follows:

> In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents

whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of properties subject to a security interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case under this title.

33. Section 363(c)(1) and (2) of the Bankruptcy Code provides as follows:

(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell or lease cash collateral under paragraph (1) of this subsection unless –

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

34. The Debtor represents that HIL has consented to the use of the Collateral conditioned upon entry of the Order.

35. The Debtor has not been able to communicate, as of the date of this Motion, with the SBA and as such, to the extent that the value of the Collateral extends beyond the obligations due to HIL, such that the SBA is secured, authority from this Court is required.

### **Adequate Protection**

36. The purpose of adequate protection is to ensure that the secured creditor receives the value for which it bargained pre-bankruptcy. In re 495 Central Park Ave. Corp., 136 B.R. 626 (Bankr. S.D.N.Y. 1992). Adequate protection is designed to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization. In re Nice, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the

value of the creditor's secured claim as of the petition date due to a debtor's continued use of the collateral").

37. Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Beker Industries Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re JKJ Chevrolet, Inc. 190 B.R. 542, 545 (Bankr. E.D.Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case).

38. The Order provides that, as adequate protection for the Debtor's use of the Secured Lender's Collateral, in consideration for the use of the cash Collateral and for the purpose of adequately protecting them from Collateral Diminution[1], the Debtor shall grant HIL and the SBA replacement liens in all of the Debtor's post-petition assets and proceeds, including the cash Collateral and the proceeds of the foregoing, to the extent that HIL and the SBA had a valid security interest in said pre-petition assets on the Petition Date and in the continuing order of priority that existed as of the Petition Date (the "Replacement Liens").

39. The Debtor submits that, in order to preserve the Debtor's estate and ensure the viability of the Debtor during the Chapter 11 case, HIL and the SBA should be granted Replacement Liens with the same nature, extent and validity of their pre-petition liens, subject to investigation by any creditors or committee appointed in the Debtor's Chapter 11 case.

40. The Replacement Liens shall be subject and subordinate only to: (a) United States Trustee fees payable under 28 U.S.C. Section 1930 and 31 U.S.C Section 3717; (b) professional fees of duly retained professionals in this Chapter 11 case as may be awarded pursuant to

---

[1] For purposes of this Order, "Collateral Diminution" shall mean any diminution in value of the Secured Creditor's interest in Debtor's property as of the Petition Date by reason of Debtor's use of Cash Collateral in accordance with this Order.

9

Sections 330 or 331 of the Code or pursuant to any monthly fee order entered in the Debtor's Chapter 11 case; (c) the fees and expenses of a hypothetical Chapter 7 trustee to the extent of $10,000; and (d) the recovery of funds or proceeds from the successful prosecution of avoidance actions pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 ("Avoidance Actions") of the Bankruptcy Code (collectively, the "Carve-Outs").

41. In addition to the liens and security interests proposed to be granted pursuant hereto, as additional adequate protection for the Debtor's use of Cash Collateral, the Debtor shall pay to HIL monthly interest only debt service payments, at the contract (non-default) rate of interest, as set forth in the HIL Loan Agreements. HIL shall also be entitled to payment of actual and reasonable attorneys' fees and expenses, in the approximate amount of $10,000 per month, which shall be paid in arrears on a monthly basis. Counsel for HIL shall deliver a monthly detailed statement for such fees and expenses to counsel for the Debtor, the U.S. Trustee and any committee (if one is appointed). Unless, within the ten (10) business day period following delivery of such invoice (the "Invoice Review Period"), the Debtor, the U.S. Trustee or a committee (if one is appointed) serve a written objection upon the requesting party, the Debtor shall pay all such reasonable fees and expenses within five (5) business days following the expiration of the Invoice Review Period. If a written objection has been served, the Debtor shall pay only such amounts that are not the subject of any objection and the withheld amount subsequently agreed by the objecting parties or ordered by the Court to be paid. Any and all amounts paid by the Debtor pursuant to this Paragraph are deemed permitted uses of Cash Collateral.

42. As no debt service is currently required under the SBA Loan Documents, no monthly payments shall be paid by the Debtor at this time.

43.  The Debtor submits that, in order to preserve the Debtor's estate and ensure the viability of the Debtor during the Chapter 11 case, it is critical that the Court approve the proposed adequate protection payments to HIL and the SBA and the grant to them of Replacement Liens with the same nature, extent and validity of HIL and the SBA's pre-petition liens, subject to investigation by any creditors or committee appointed in the Debtor's Chapter 11 case.

### The Budget

44.  The Debtor proposes to use Collateral only for ordinary and necessary operating expenses substantially in accordance with the operating budget annexed hereto as **Exhibit "I"** (the "Budget"). The Debtor believes that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course of operating the Debtor's business for the period set forth in the Budget. The Debtor believes that the use of Collateral in accordance with the Budget will provide the Debtor with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

### Notice

45.  This Motion is being served on notice to all of the Debtor's secured creditors and all other parties asserting secured claims against the Debtor, as well as the United States Trustee and all other parties entitled to notice pursuant to Bankruptcy Rule 4001(d), including but not limited to the Debtor's twenty (20) largest unsecured creditors.

**WHEREFORE**, the Debtor respectfully requests entry of the Order, together with such other and further relief as is just and proper under the circumstances.

Dated: Scarsdale, New York
April 12, 2021

                Respectfully submitted,

                KIRBY AISNER & CURLEY LLP
                *Proposed Attorneys for the Debtor*

                By: */s/ Erica R. Aisner*
                     Erica R. Aisner, Esq.
                     700 Post Road, Suite 237
                     Scarsdale, New York 10583
                     (914) 401-9500
                     eaisner@kacllp.com